**FILED**

APR **2 6** 2006

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

*In the*

**United States Court of Appeals**

**For the Seventh Circuit**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
26 2006

No. 04-3527

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ALAN K. CHERRY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 1049—**Milton I. Shadur,** *Judge.*

ARGUED JUNE 15, 2005—DECIDED FEBRUARY 3, 2006

Before POSNER, COFFEY, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Alan Cherry was caught with a
gun during a traffic stop and later pleaded guilty to
possession of a firearm by a felon, 18 U.S.C. § 922(g)(1). In
his plea agreement, Cherry preserved his right to chal-
lenge on appeal the denial of his motion to suppress the
gun, which was found in the trunk of his car. The propriety
of that search is the only issue before us.

Cherry's encounter with Joliet, Illinois, police began
when he was stopped on Interstate 80 for speeding and
failing to signal a lane change. Officer Harris testified at
the suppression hearing that he smelled burnt mari-
juana as he approached Cherry, who provided a driver's

license but not proof of insurance. Harris then walked behind the car to deliver Cherry's licence to another officer, Officer May, while a third officer, Officer Batis, approached the car from the passenger's side. Batis testified that from his vantage point he saw a plastic bag protruding from Cherry's right-front pants pocket. Batis gestured to Harris, who testified that he understood the signal to mean that Batis saw contraband. The officers directed Cherry to exit the car, and when he did, according to Harris, the bag of marijuana in his pants pocket was visible. The officers searched Cherry, seized the marijuana, and placed him in custody. Harris then issued three tickets—for speeding, failing to signal, and driving without proof of insurance—and began completing a tow sheet to record the condition and contents of Cherry's car. At the same time Batis and May began an inventory search of the car. May found the gun in the trunk.

After he was charged in federal court, Cherry challenged the admissibility of the gun. He argued that he never should have been ordered out of his car and searched because Officer Batis could not possibly have seen the marijuana while he was still seated in the car. And, Cherry continued, since the search revealing the marijuana was unconstitutional, his drug arrest was unlawful and the inventory search that uncovered the gun was tainted.

Although Cherry was not charged with possession of marijuana, the district court first addressed its discovery. The court focused on two photographs, introduced by Cherry, of a car similar in make and model to his. The photographs show a front-seat console that the court opined would have blocked Officer Batis's view of the plastic bag in Cherry's pants pocket. The court also questioned why Officer Harris testified that he relied on Batis's observations as the basis for directing Cherry to exit the car, when Harris stated in his arrest report and

testified that he himself smelled burnt marijuana. In a
tenuous ruling, the court found Batis not credible and,
apparently on that basis alone, concluded that the sei-
zure of the marijuana and the arrest of Cherry did not
justify the inventory search that uncovered the gun. And
though the district court never explicitly discredited
Harris or explained why the officers did not have prob-
able cause to arrest Cherry and search his car based
solely on Harris's unchallenged testimony that he smelled
burnt marijuana, the court moved on to consider whether
the circumstances of the traffic stop were enough to
authorize the inventory search.

The court observed that the traffic stop and subsequent
revelation that Cherry lacked proof of insurance, under
the written policies of the Joliet Police Department,
prevented him from moving his car from its location
alongside the interstate. In this circumstance, the court
found, department policy required that the car be towed.
And, the court continued, when a car is towed "on the
authority" of an officer, department policy also requires an
inventory search. Thus, despite concluding that it must
ignore the marijuana, the court still reasoned that the
inventory search had been authorized. The court, though,
explained that it was denying the motion to suppress
based upon the doctrine of "inevitable discovery."

Given the district court's analysis, the parties debate
whether the admission of the gun was justified under the
"inevitable discovery" doctrine, but resort to that doc-
trine is unnecessary. The "inevitable discovery" doctrine
is a means for the government to avoid suppression of
evidence obtained as the result of unlawful conduct by
the police, *see, e.g., United States v. Brown*, 328 F.3d
352, 356-57 (7th Cir. 2003); *United States v. Langford*, 314
F.3d 892, 895 (7th Cir. 2002), and for the doctrine to
apply the government must prove by a preponderance
that authorities "*would* have found the challenged evi-

dence through lawful means." *United States v. Jones*, 72
F.3d 1324, 1334 (7th Cir. 1995) (emphasis added); *see Nix
v. Williams*, 467 U.S. 431, 444 (1984); *United States. v.
Pittman*, 411 F.3d 813, 817 (7th Cir. 2005); *United States
v. Johnson*, 380 F.3d 1013, 1014 (7th Cir. 2004). In this
case, however, the government has always contended that
Joliet Police officers *did* find the gun through lawful
means. We recognize that the government has inex-
plicably abandoned reliance on Officer Harris's testimony
that he smelled marijuana—which seems a simple and
compelling foundation for searching Cherry and ultimately
the car including the trunk, *see United States v. Wimbush*,
337 F.3d 947, 950-51 (7th Cir. 2003) (smell of marijuana
gave rise to probable cause for warrantless search of
vehicle revealing marijuana in passenger compartment);
*United States v. McGuire*, 957 F.2d 310, 314 (7th Cir.
1992) (presence of contraband in passenger compartment
is probable cause to search entire vehicle, including trunk,
for additional contraband); *see also United States v. Foster*,
376 F.3d 577, 583-84, 588 (6th Cir. 2004) (smell of mari-
juana coming from vehicle provides probable cause to
search without warrant); *United States v. Brown*, 334 F.3d
1161, 1173 & n.11 (D.C. Cir. 2003) (discovery of contra-
band in passenger compartment "is a factor that strongly
supports the lawfulness of a trunk search"); *United States
v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000) (smell of burnt
marijuana gave police probable cause to search truck for
drugs); *cf. United States v. Nielsen*, 9 F.3d 1487, 1491
(10th Cir. 1993) (search of trunk reasonable if initial
search of passenger compartment, premised on smell of
burnt marijuana, produces contraband). The government
now focuses exclusively on the fact that Cherry lacked
proof of insurance when the police stopped him; his lack
of insurance, the government argues, was a valid basis
for conducting the inventory search even if finding the
marijuana on Cherry was not. But this is an argument

that the search of the trunk was lawful, not an argument—like "inevitable discovery"—that unlawful conduct should not result in suppression.

Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment. *United States v. Wilson*, 938 F.2d 785, 788 (7th Cir. 1991). Searches conducted by the police prior to towing a car are "lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *Pittman*, 411 F.3d at 817. We review a district court's conclusion that police officers "followed standard procedure while conducting an inventory search" for clear error, *United States v. Lozano*, 171 F.3d 1129, 1132 (7th Cir. 1999); *see also United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004); *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996); *United States v. Privett*, 68 F.3d 101, 104 (5th Cir. 1995), but our review of the reasonableness of the inventory search and seizure is plenary, *see United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005); *United States v. Jackson*, 189 F.3d 502, 507 (7th Cir. 1999); *United States v. Haro-Salcedo*, 107 F.3d 769, 771 (10th Cir. 1997).

We turn first to the district court's finding that the written police policies of the Joliet Police Department authorized the inventory search of Cherry's car. The court relied on two written policies. General Order 17-3 requires an inventory search "[a]ny time a vehicle is towed on the authority of a member of [the Joliet Police] Department," except in the case of a traffic accident. *See* Gen. Order 17-3, "Towing Vehicles," § 1.3 (2003). General Order 17-18, in relevant part, establishes procedures for enforcing the Illinois Mandatory Insurance Law ("I.M.I.L."), 625 Ill. Comp. Stat. 5/3-707:

6                                                    No. 04-3527

5.  ENFORCEMENT PROCEDURE

5.1   When a sworn member stops a vehicle for a traffic law violation or investigation of a traffic accident, he will request proof of insurance documents from vehicle operators. No member will stop a vehicle solely for the purpose of verifying the existence of a valid insurance policy.

5.2   If an operator is not driving an exempt vehicle, and cannot or will not provide proof of insurance documentation, the officer will then:

   A.  in addition to any other citations, issue a citation for violation of Chapter 625 ILCS 5/3-707.

   B.  cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's licence. If, however, the driver does not have a valid driver's licence and does not have proof of insurance, the member must tow and impound the vehicle. The vehicle will then be released only upon a showing of proof of insurance for the motor vehicle that was impounded and notarized written consent of the release by the vehicle owner.

. . . .

6.  TOWING PROCEDURE

6.1   Vehicles will be towed only under the following circumstances:

   A.  when LEADS message information verifies state registration for the vehicle has

been suspended for non-compliance with the I.M.I.L.

B. If, after being cited for violation of the I.M.I.L., the driver either drives away or attempts to drive away.

C. If a second citation is issued to the same driver by the same officer during the same tour of duty.

6.2 If the vehicle is towed, an Offense Report, and a Vehicle Inventory and Tow Report are required.

Gen. Order 17-18, "Illinois Mandatory Insurance Law," §§ 5, 6 (2003). The district court read General Order 17-3 to require an inventory search when a police officer causes a car to be towed, and in turn relied on General Order 17-18 to provide officers the authority to order the tow of Cherry's car (because without proof of insurance Cherry could not move his car to a legal parking place).

We cannot say that the district court committed clear error in finding that the Joliet police officers followed standard procedure in conducting the inventory search of Cherry's car. General Order 17-18 prevented Cherry from driving his car after the police discovered he lacked proof of insurance. And, because the car was located alongside the interstate—where it presented a public safety hazard—the police were authorized to order it towed to a safe location.[1] Their authority to order such a tow in the

---

[1] Cherry does not argue that police engineered the initial traffic stop in this case as a "subterfuge for criminal investigations." *South Dakota v. Opperman*, 428 U.S. 364, 371 n.5 (1976). Regardless, our interpretation of the Joliet policy would not, as the dissent posits, allow police to "use the policy on inventory
(continued...)

8                                          No. 04-3527

interest of public safety is unassailable. *See South Dakota v. Opperman,* 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *see, e.g., United States v. Briggs,* 273 F.3d 737, 739 (7th Cir. 2001) (truck towed from alongside road because driver's license suspended). Moreover, a third written policy introduced by the government, General Order 17-4, provided unambiguous authority for the police to tow Cherry's car. *See* Gen. Order 17-4, "Illegally Parked, Abandoned and Inoperable Vehicles," § 2.4 (2003). The policy states that "ANY VEHICLE THAT PRESENTS AN IMMEDIATE HAZARD TO PUBLIC SAFETY WILL BE TOWED" and defines "immediate hazard" to include a vehicle that "creates or constitutes a traffic hazard which impedes the efficient movement of traffic" or "obstructs or may obstruct the movement of any emergency vehicle." *Id.* at §§ 2.4, 1 (capitalization in the original). As the officers testified, without challenge from Cherry, a car parked alongside an interstate highway meets this definition.

Cherry urges a different interpretation of the policies, principally arguing that § 6.1 of General Order 17-18 is exhaustive as to the circumstances under which a tow is authorized. That contention, however, ignores that Cherry's car was towed not only because he lacked proof

---

[1] (...continued)
searches to authorize illegal investigatory searches," *post,* at 17, by simply arranging to stop *any* motorist alongside the interstate. The police's authority to search Cherry's car rested on his inability to produce proof of insurance. Had he been able to drive his car after the routine traffic stop, and had police not pursued the alternate justification that they smelled burning marijuana, it is unlikely that the inventory search could have occurred. *See Knowles v. Iowa,* 525 U.S. 113, 117 (1998).

No. 04-3527                                                              9

of insurance but also because the car could not be left
alongside the interstate without creating a hazard—a
circumstance not addressed in General Order 17-18.
General Order 17-4, which Cherry does not confront, ex-
plicitly addresses parked vehicles that present a hazard
and provided unambiguous authority to tow Cherry's car.
And, though he may disagree with the reading given
General Order 17-18 by the police witnesses and the
district court, we do not understand why General Order
17-4 is not dispositive.

The officers' testimony at the suppression hearing,
moreover, confirms the district court's view of police policy.
See Lomeli, 76 F.3d at 149 (relying in part on officer's
understanding of police policy). Officers Batis and Harris
both testified that the police department's "common
practice" is to tow illegally parked cars after an officer
discovers the driver lacks insurance. Harris did acknowl-
edge an alternate reading of the written policy when cross-
examined by Cherry's attorney, but Batis testified with-
out challenge that Cherry's car had to be towed (after
an inventory search) because it was parked illegally. The
officers' testimony strengthens our view that the dis-
trict court's finding was not clearly erroneous.[2]

Nor was the search unreasonable. "Warrantless inven-
tory searches of cars in police custody are also proper as

_____

[2] The dissent observes that police "conduct cannot fill a gap in
the policy" because, in this case, the police searched Cherry's car
"because they were looking for marijuana." Post, at 18. The
officers, though, testified to the department's "established
routine" for such stops. See Florida v. Wells, 495 U.S. 1, 4 (1990);
United States v. Lozano, 171 F.3d 1129, 1132 (7th Cir. 1999);
United States v. Duguay, 93 F.3d 346, 350-51 (7th Cir. 1996).
Their testimony—that cars like Cherry's are towed as a mat-
ter of practice—is consistent with our interpretation of Joliet
policy.

long as the police lawfully have custody of the vehicles."
*United States v. Jensen,* 169 F.3d 1044, 1048 (7th Cir.
1999). Here, again relying on General Order 17-18, Cherry
argues that it was unnecessary for the police to take
custody of his car and trigger an inventory search because,
in his view, he had the option of requesting a towing
company (and presumably specifying the destination of
the car). *See* Gen. Order 17-18, at § 5.2(B). But, putting
aside that Cherry never did say that he wanted to ar-
range for a tow himself, the answer is the same: General
Order 17-4, not General Order 17-18, covers parked
vehicles that present a hazard, and General Order 17-4
directed the police to tow the car. That directive does not
compel the officers at the scene to invite or accept
input from the motorist as to the appropriate disposition
of his vehicle, nor does the Fourth Amendment demand
that police offer a motorist an alternative means of
removing his vehicle that will avoid the need to tow it and
conduct an inventory search.[3] *See Colorado v. Bertine,* 479
U.S. 367, 373-74 (1987) (police need not give motorist "an
opportunity to make alternative arrangements" that avoid
impoundment); *Illinois v. Lafayette,* 462 U.S. 640, 647
(1983) ("The reasonableness of any particular governmen-
tal activity does not necessarily or invariably turn on the
existence of alternative 'less intrusive' means."); *Privett,* 68
F.3d at 104 (finding search within inventory exception
to Fourth Amendment, even though vehicle could have

---

[3] We decline to reach the hypothetical suggested by the dissent,
*post,* at 19. The record does not show that Cherry requested that
a specific company tow his car to his home, or elsewhere.
*Colorado v. Bertine* does not require the police to offer that
alternative, *see* 479 U.S. 367, 373-74 (1987), and thus we
need not decide whether police would have a valid interest in
conducting an inventory search of a car under those circum-
stances.

No. 04-3527                                                    11

been towed to motorist's home rather than impound lot); *United States v. Skillern*, 947 F.2d 1268, 1275-76 (5th Cir. 1991) (police not required to offer motorist alternative to impoundment); *cf. United States v. Penn*, 233 F.3d 1111, 1116-17 (9th Cir. 2000) (absent policy requiring consent of owner for search, police need not allow motorist to remove property from car prior to routine inventory search). Thus, even if events conspired to deprive Cherry of the opportunity to request a specific towing company, no Fourth Amendment violation has occurred; the police were free to tow his hazardously parked car pursuant to their standard policy, in furtherance of their "community caretaking" function. *See Cady v. Dombrowski*, 413 U.S. 433, 441 (1973); *see Opperman*, 428 U.S. at 375-76; *Lomeli*, 76 F.3d at 148 (7th Cir. 1996).

AFFIRMED.

    POSNER, *Circuit Judge*, dissenting. Police who lawfully impound a car or other vehicle have a right to search it stem to stern in order to take an inventory of its contents, because they're responsible for those contents for as long as the car and its contents are in their custody. *Colorado v. Bertine*, 479 U.S. 367, 373 (1987) ("by securing the property, the police protected the property from unauthorized interference. Knowledge of the precise nature of the property helped guard against claims of theft, vandalism, or negligence. Such knowledge also helped to avert any danger to police or others that may have been posed by the property"); *South Dakota v.*

*Opperman*, 428 U.S. 364, 372-73 (1976); *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) ("warrantless inventory searches of vehicles are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property"). Whatever they see in the course of a lawful inventory search, as in any other lawful search, they can seize and use as evidence against the car's owner.

Cherry was stopped by police for speeding and for changing lanes without signaling. A stop for a routine traffic offense (as distinct from a lawful custodial arrest of the driver or an occupant, *Thornton v. United States*, 541 U.S. 615, 617 (2004); *United States v. Pittman, supra*, 411 F.3d at 815-16) does not justify a search of the car. *Knowles v. Iowa*, 525 U.S. 113, 117-18 (1998); *United States v. Garcia*, 376 F.3d 648, 650 (7th Cir. 2004); *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003). But one police officer testified that when he approached the car after pulling it over he saw a bag of marijuana, and a second officer testified that he smelled marijuana; so the police searched the car and in the trunk found a gun. The district judge disbelieved the testimony of the officer who said he had seen a bag of marijuana, but without considering the credibility of the other officer held the seizure of the gun legal on the ground that the police would have impounded the car after stopping it for the traffic offenses because Cherry had no proof of liability insurance, and that having impounded it the police would have conducted a lawful inventory search, which would have turned up the gun.

*Florida v. Wells*, 495 U.S. 1 (1990), holds that inventory searches are proper only when they are conducted pursuant to "standardized criteria" or "established routine." *Id.* at 4; see also *Colorado v. Bertine, supra*, 479 U.S. at 374

n. 6, 375-76; *South Dakota v. Opperman, supra*, 428 U.S. at 374-76; *United States v. Wilson*, 938 F.2d 785, 788-90 (7th Cir. 1991); *United States v. Bullock*, 71 F.3d 171, 177-78 (5th Cir. 1995); *United States v. Marshall*, 986 F.2d 1171, 1175 (8th Cir. 1993). That makes it sound as if the constitutionality of the search depends on whether the police have complied with local law. But that can't be right. If the local law violates the Constitution, compliance with the local law cannot justify the search; and if a search is reasonable within the meaning of the Fourth Amendment, the fact that it violates local law does not give the defendant a federal remedy. *United States v. Delaporte*, 42 F.3d 1118, 1119 (7th Cir. 1994); *Gordon v. Degelmann*, 29 F.3d 295, 300-01 (7th Cir. 1994); *United States v. Clyburn*, 24 F.3d 613, 616-17 (4th Cir. 1994). An inventory search might not be authorized by a policy, but if the search conducted by the police was in fact a reasonable inventory search—maybe they searched the car because they feared being accused of stealing the owner's property—there would be no basis for a constitutional objection.

The cases like *Wells* that emphasize standardized criteria, standard procedures, established routine, and the like worry that in the absence of formal procedures determining the metes and bounds of inventory searches, police officers would search cars at will for evidence of crime and if challenged say they were conducting an inventory search. The inventory search would then be "a pretext concealing an investigatory police motive." *South Dakota v. Opperman, supra*, 428 U.S. at 376. "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells, supra*, 495 U.S. at 4. Compliance with established procedures is merely a ruse antidote. "[A] locally followed practice gives some assurance that a particular car was not singled out for special searching attention. Absent such assurance some special reason for

the taking of safeguarding or security precautions that are not customarily taken should exist if the intrusion resulting from the taking of such precautions is to be rendered reasonable under the fourth amendment." *United States v. Hellman*, 556 F.2d 442, 444 (9th Cir. 1977).

In other words, the absence of a rule creates a presumption that the search was not a bona fide inventory search. There is no need to go further and insist that inventory searches *always* violate the Fourth Amendment unless they comply with a preexisting rule, and thus to supplement, *Miranda*-like, the Constitution in order to make it easier for the courts to detect constitutional violations. That an inventory search can violate such a rule without violating the Fourth Amendment is shown by *United States v. Lomeli*, 76 F.3d 146, 149 (7th Cir. 1996). The inventory-search rule required that inventory searches be conducted at the scene of the arrest, but the search of Lomeli's vehicle was conducted at the police station instead. The court held that the search complied with the Fourth Amendment because the motive for violating the rule was simply that the superior lighting at the police station would enable the police to better account for and secure any valuables they might find in the vehicle. The inventory search was not a pretext for investigation.

Whether the requirement of a preexisting rule is rigid, as *Wells* implies, or, as we thought in *Lomeli* and the Ninth Circuit thought in the *Hellman* case, can bend, we must examine the Joliet Police Department's policy governing the impoundment of vehicles to make sure that an inventory search would have been the expected sequel to Cherry's inability to prove that he had liability insurance; for if not the inevitable-discovery rule cannot save the search.

This is a difficult inquiry because the department's policy, a written policy (it need not be to pass muster,

*United States v. Duguay*, 93 F.3d 346, 351-52 (7th Cir. 1996); *United States v. Walker*, 931 F.2d 1066, 1068 (5th Cir. 1991), but the only policy to which we have been directed in this case is written), is a mess. The provision that appears to govern this case is General Order 17-18 § 5.2(B), which provides that if the driver of a vehicle stopped by the police can't produce proof of liability insurance, the police shall either "cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's license. If, however, the driver does not have a valid driver's license and does not have proof of insurance, [the police officer] must tow and impound the vehicle." Cherry had a valid driver's license but his car was not legally parked, having been stopped by the police at the side of a busy highway, so the first clause of the first sentence in paragraph 5.2(B) was not applicable. But the second one was, and it says nothing about impoundment. The car has to be towed, but why to a police lot unless the police want to search it on the basis of "suspicion of evidence of criminal activity"?—an improper motive (unlike the motive in *Lomeli*) for an inventory search, *Colorado v. Bertine, supra*, 479 U.S. at 375, as it has nothing to do with the purposes, quoted from *Bertine* above, of such a search. See also *United States v. Duguay, supra*, 93 F.3d at 353-54; *United States v. Ibarra*, 955 F.2d 1405, 1410 n. 5 (10th Cir. 1992).

Granted, we may have gone too far when we said in *United States v. Duguay, supra*, 93 F.3d at 353, that "the decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." The Supreme Court's decision in *Bertine* suggests that a rule that all towed vehicles shall be impounded is reasonable within the meaning

of the Fourth Amendment; the owner need not be given an opportunity to make alternative arrangements even if they would protect the valid interest of the police in shielding themselves from charges of theft or damage to the owner's property as well as from the danger that the vehicle may contain weapons that might be used against them. *Colorado v. Bertine, supra,* 479 U.S. at 373-74.

But Joliet has not gone to the outer limits permitted by the Court. Its policy says that if the driver can't produce proof of liability insurance, the police shall either "cause the vehicle to be left legally parked, or, at the request of the operator, notify a tow company of the operator's choice, if the operator has a valid driver's license." It does not authorize impoundment when the driver has a valid license—unless *"left* legally parked" makes the entire sentence applicable only to legally parked cars, which is to say to situations in which the driver, though he could leave the car where it is, may prefer that it be elsewhere, presumably his home. If so, he can have it towed there instead of leaving it where it is. (He is not permitted to drive it there because he lacks proof of insured status.) But that would leave unaddressed the situation in which the driver, though he has a valid driver's license, is parked illegally.

It might be thought that the reason that situation is left unprovided for is that *of course* a car can be towed if it is illegally parked on a public street, General Order 17-4 § 2.4; and in the usual case there is no one in the car and so the tow *necessarily* is arranged by the police and the car is in their custody and therefore they can conduct an inventory search. *South Dakota v. Opperman, supra,* 428 U.S. at 375-76; *United States v. Pittman, supra,* 411 F.3d at 817; *United States v. Kimes,* 246 F.3d 800, 804 (6th Cir. 2001). That is the provision of Joliet's policy on which the majority hangs its hat. But the only reason Cherry's car was illegally parked was that he'd been pulled over by

the police, so he was present and therefore there was no need for the police rather than Cherry to handle the tow. It would be bootstrapping for the police to argue that if they want to search a car that they've stopped for speeding or some other traffic offense that would not ordinarily justify a search of the car all they have to do is arrange to stop it in a place where it cannot be parked legally. That would be to use the policy on inventory searches to authorize illegal investigatory searches.

To make matters still more confused, General Order 17-18 § 6.1 provides that "vehicles will be towed only under the following circumstances"—and none of them is applicable to this case. This is in flat contradiction of the preceding section of General Order 17-18 (§ 5.2(B)). And then there is General Order 17-3 § 1.3(A), which provides that any time the police order a car towed, they shall conduct an inventory search. This is also in conflict with section 5.2(B), which requires towing if the driver has no proof of insurance, but impoundment only if, in addition, he doesn't have a valid driver's license (which Cherry, remember, did).

Suppose General Order 17-3 § 1.3(A) takes precedence and therefore authorizes an inventory search even when the car is towed to the driver's home by a tow company summoned by the driver. The district court thought that, if so, that's the end of the case. That is incorrect. A police department's policy concerning inventory searches cannot override the Fourth Amendment. Police cannot demand entry into a person's home in order to inventory the contents. An inventory search has to be in service of a legitimate interest unrelated to suspicion of criminal activity if it is to comply with the Constitution. No such interest is engaged if the driver is present when the car is stopped, he arranges the tow, and the car is towed to his home. In such a case there is no constitutional basis for an inventory search because the car and its contents

No. 04-3527

are never in police custody. E.g., *People v. Litchfield*, 918
P.2d 1099, 1105-06 (Colo. 1996); *Fortson v. State*, 412
S.E.2d 833, 834-35 (Ga. 1992); *Caplan v. State*, 531 So.2d
88, 90 (Fla. 1988); cf. *United States v. Edwards*, 242 F.3d
928, 938 (10th Cir. 2001).

So this interpretation of Joliet's policy, which would be
necessary to uphold an inventory search in this case,
would be unconstitutional. The constitutional interpreta-
tion would not justify the search. I said earlier that an
inventory search could be proper even if it didn't comply
with a formal policy on such searches, but the only jus-
tification that could be offered for an inventory search in
this case would be compliance with Joliet's policy. The
police of course searched Cherry's car not because they
thought they were conducting an inventory search but
because they were looking for marijuana, so their con-
duct cannot fill a gap in the policy. In sum, then, neither
the Joliet policy, nor the circumstances, justified the
police in impounding Cherry's car; and without impound-
ment, there was no justification for an inventory search
of the car.

Two of our cases uphold inventory searches without
discussion of whether the defendant's car was impounded,
*United States v. Bass*, 325 F.3d 847, 849-50 (7th Cir. 2003);
*United States v. Sholola*, 124 F.3d 803, 808, 818 (7th Cir.
1997), but their silence should not be understood to
signify that police can conduct an inventory search even
though they have no grounds for taking custody of the
vehicle. Unless it's impounded and the owner therefore
deprived of custody of its contents, there is no constitu-
tional basis for an inventory search. *United States v.
Privett*, 68 F.3d 101, 104 (5th Cir. 1995), says that "the
police could have permissibly conducted an inventory
search even if the car was towed to [the defendant's]
home," but in the actual case it was not towed there. The
only reason the court gave for its statement was "the

problem of security of the contents." If, however, the owner of the car has it towed to his home by the towing company of his choice, the police have no valid interest in inventorying the contents because they are not potentially responsible for any loss of or damage to them, they are not endangered by the contents, and the owner has taken it on himself to protect the property from being damaged or lost en route to his home.

The judgment cannot be upheld on the basis of the district court's reasoning. The case should be remanded for a determination of the credibility of the officer who testified that he smelled marijuana. If that testimony is credited by the district judge, there was probable cause to search the car; if not, not, and the evidence of the gun should be suppressed.

A true Copy:

    Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*